**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **KIMBERLY ANDERSON,** | |
| **Plaintiff,** | **No. 12 CV 3871** |
| v. | **Magistrate Judge Mary M. Rowland** |
| **CAROLYN W. COLVIN, Acting Commissioner of Social Security,**[1] | |
| **Defendant.** | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kimberly Anderson filed this action seeking reversal of the final decision of the Commissioner of Social Security (Commissioner) denying her applications for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act (SSA). 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and have filed cross motions for summary judgment. For the reasons stated below, the Commissioner's decision is remanded for further consideration consistent with this opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB) or Supplemental Security Income (SSI) under Titles II and XVI of the SSA, a claimant must establish that he or she is

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 26(d)(1).

disabled within the meaning of the SSA.[2] *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on May 6, 2009, alleging that she became disabled on January 31, 2009, because of fibromyalgia, carpel tunnel, and migraines. (R. at 38, 146–47). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 63, 65). On February 14, 2011, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 33–53). The ALJ also heard testimony from Kerry Seaver, a vocational expert (VE). (*Id.* at 53-60). The ALJ denied Plaintiff's request for benefits on March 11, 2011. (*Id.* at 20–28).

Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since January 31, 2009, the alleged onset date.[3] (R. at 22). At step two, the ALJ found that Plaintiff has the following medically determinable severe impairments: fibromyalgia, carpel tunnel syndrome of the right hand, lupus, depression, bipolar disorder, and migraine headaches. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 22–23).

---

[3] Prior to engaging in the five-step sequential process, the ALJ determined that Anderson met the insured status requirements of the Social Security Act through March 31, 2009. (R. at 22). Therefore, Plaintiff must establish that she was disabled prior to that date in order to qualify for DIB. *Bjornson v. Astrue,* 671 F.3d 640, 641 (7th Cir.2012) ("only if [plaintiff] was disabled from full-time work by [her last insured] date is she eligible for benefits").

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[4] and determined that she can perform light work with the following additional limitations: "a sit/stand option [during an eight hour day]; no ladder, rope or scaffold climbing; occasionally stooping and crouching; no kneeling or crawling; performing fine and gross motor manipulation with the right hand; performing simple repetitive tasks in only low stress jobs." (R. at 23). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff is unable to perform past relevant work as a certified nurse's aide. (*Id.* at 27). At step five, based on Plaintiff's RFC, her vocational factors, and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the regional economy that Plaintiff can perform, including information clerk, sorter and cashier. (*Id.* at 27–28). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the SSA. (*Id.* at 28).

The Appeals Council denied Plaintiff's request for review on April 16, 2012. (R. at 1). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of

---

[4] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young*, 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

# IV. DISCUSSION

## A. The Relevant Medical Evidence

Plaintiff is a 44-year-old woman who lives with her adult daughter and her grandson, age 11. (R. at 44). When her job as a nursing home care provider ended in January 2009, Anderson did not look for similar work because she did not "trust [herself] as far as lifting people." (*Id.* at 39). She testified that she has constant pain that "burns . . . aches and [is] giving [her] numbness." (*Id.*). Her entire right side is affected since carpel tunnel hurts her fingertips to her shoulder, and her back problems impact her buttocks to her ankle. (*Id.* at 40). Nine months prior to the hearing, she switched doctors from Dr. P. Sales to Dr. Tracy Muhammad because she "just didn't feel like [she] was getting anywhere with Dr. P. Sales, I was steady having pain and [Sales] was just giving me pain meds." (*Id.*).

According to her testimony, she is doing physical therapy for the fibromyalgia and the doctors are discussing "injections in [her] back." (R. at 43). She is right-handed and has had carpel tunnel in her right hand since October 2010. (*Id.*). She wears splints and plans to see a surgeon. (*Id.* at 43–44, 47). She testified that she takes a variety of medications for her mental health and her physical symptoms. (*Id.* at 44). Anderson also testified that she attends therapy three times a week, both individual and group, for depression and bipolar disease. (*Id.* at 41).

In terms of her physical abilities, Anderson testified that she could stand for 15–20 minutes at a time, can walk a block or two, but only with pain. (R. at 44). She is driven to medical appointments by a medical car service. (*Id.* at 46). She can sit for

about 15 minutes, but "[i]t starts to hurt immediately." (*Id.*). She described her pain as pressure building in her back, buttocks and her leg and arm. (*Id.*). She testified that she can lift 5-10 pounds. She drops things because her fingers swell, and she wears her brace all of time, except to wash her hands. (*Id.* at 49). Because of discomfort, she has not slept in her bed for "over maybe six months." (*Id.* at 50). She had been sleeping in the reclining chair "but now [she] can't sit in the chair and be comfortable." (*Id.*). She also testified that with all the drugs she is taking she falls asleep; therefore, she no longer drives and is not able to wait at a bus stop. (*Id.* at 51). She nods off to sleep after she takes her medicine for about 30 minutes every day and has a migraine at least once a week. (*Id.* at 52).

Her daily activities include getting her grandson off to school and doing housework. (R. at 45). She cooks meals but mostly prepared foods. (R. at 52). She spends "all day long" doing housework because her physical ailments make it so much more difficult for her to get tasks done.[5] For instance, when doing laundry, she tosses clothes over the stairs as opposed to carrying them down the stairs. When she does go downstairs, she takes one stair at a time. She carries clean laundry back upstairs a few pieces at a time. (*Id.* at 47–49). She does the grocery shopping and neighbors sometimes help her bring the groceries in from the car. (*Id.* at 48).

The VE testified that there are jobs available for a person who is limited to light work with a sit/stand option; never climbing ladders, ropes, or scaffolds; never kneeling or crawling; only occasionally climbing ramps or stairs, stooping, and

---

[5] Anderson's adult daughter receives disability benefits because of mental illness, (R. at 47–48), and is unable to assist with chores, (*id.* at 28).

crouching; only simple, routine, and repetitive tasks in a low-stress setting; and on-ly *frequent* handling and fingering with the right hand. (R. at 54–55). Specifically, the VE stated that such a person could perform the occupations of an information clerk, cashier, and sorter. (*Id.* at 55, 59–60). The VE further testified that these same jobs would also be available to a person who was limited to only *occasional* handling and fingering. (*Id.* at 55, 59–60).

In March 2002, Anderson treated with Dr. Chinyoung Park from the rheumatol-ogy department at the University of Chicago Medical Center. Anderson reported a full year of joint pain in the elbows, left knee, right groin and under the arms. (R. at 256). The pain was migratory and intermittent, lasting a few days at a time. She also reported low back pain for the year where the entire back was in spasms. Dur-ing the preceding six months, Anderson experienced numbness over the fingers and big right toe, intermittently. (*Id.*). Her past medical history included asthma for three years, peptic ulcer disease for over ten years and migraine headaches. She al-so had a family history of lupus. Upon examination, Dr. Park noted that she had no rash and had a full range of motion. (*Id.*). She also had "diffuse tenderness to light palpitation of the entire back, anterior chest wall and upper extremity." (*Id.*). Dr. Park noted an "ANA abnormality"[6] but opined that it was related to the family his-tory of lupus since she "did not have any specified symptoms on examination com-patible with connective tissue disease" and all other lab results were unremarkable.

---

[6] Antinuclear antibodies (ANAs) are "autoantibodies that bind to contents of the cell nu-cleus. . . . Autoantibody screening is useful in the diagnosis of autoimmune disorders and monitoring levels helps to predict the progression of disease." <en.wikipedia.org/wiki/Anti-nuclear_antibody>

(*Id.*). Dr. Park diagnosed pain syndrome and/or fibromyalgia and referred Anderson to a pain clinic. (*Id.*). Because of her history of asthma and peptic ulcer disease, Park concluded that Anderson was a poor NSAID therapy candidate for pain control.[7] (*Id.*)

Treatment records from Sales & Sales, M.D. span November 2007 through August 2010. Although the ALJ incorrectly notes that the treatment period is "between June 2008 and May 2009," he correctly notes that the records are largely illegible. (R. at 25). In addition to the intermittent case of bronchitis, Dr. Sales consistently prescribes medication for migraine headaches and for pain relief resulting from fibromyalgia and back pain. (*Id.* at 273, 275–81, 308–10, 337–48, 399–400).

Dr. Sales diagnosed arthritis pain in the left hand on March 17, 2008, (R. at 314), and fibromyalgia on July 25, 2008. (R. at 279). Anderson continued to complain of muscle aches on August 4, 2008. (*Id.* at 311 & 348). An ANA screen conducted at Roseland Community Hospital on October 6, 2009 was positive. (*Id.* at 330).

A sensory NCS conducted on October 13, 2009, diagnosed "mild changes of right carpel tunnel affecting motor branch" in the right side.[8] (R. at 331–32 & 350–51). On January 22, 2010 and February 9. 2010, Dr. Sales diagnosed carpel tunnel bilateral. (*Id.* at 301–02).

---

[7] Nonsteroidal anti-inflammatory drugs (NSAIDs) "are a class of drugs that provides analgesic and antipyretic (fever-reducing) effects, and, in higher doses, anti-inflammatory effects." <en.wikipedia.org/wiki/NSAID>

[8] "A nerve conduction study (NCS) is a medical diagnostic test commonly used to evaluate the function, especially the ability of electrical conduction, of the motor and sensory nerves of the human body." <en.wikipedia.org/wiki/Nerve_conduction_study>

Anderson reported a painful left knee on February 14, 2008. (R. at 317). Dr. Sales ordered an x-ray, which was conducted at Roseland Community Hospital on March 10, 2008, and indicated that there is no fracture but there is a minimal narrowing of the medical compartment which could be very early degenerative change. (*Id.* at 321, 314). By April 2, 2009, Dr. Sales had diagnosed degenerative osteoarthritis in the knees. (*Id.* at 275, 308).

Beginning in at least February of 2009, the records indicate Anderson's complaints about back spasms radiating down her leg. (R. at 276, 309 & 345). On February 27, May 22 and May 26, 2010, Anderson complained of severe back pain. (*Id.* at 400–02). Sales ordered an MRI of the lumbar spine that showed degenerative changes at multiple levels of the lumbar spine, and moderate stenosis at L4-5. (*Id.* at 403–04). In August of 2010, Anderson was still complaining of severe back pain. (*Id.* at 397–98). She had a neurological consult with Dr. Alan Shepard on August 27, 2010.[9] He reviewed the MRI and conducted an examination. He concluded that Anderson was "suffering . . . from a sciatica condition." (*Id.* at 461). He noted that Anderson was wearing a wrist splint on her right wrist. (*Id.*). He recommended physical therapy and a pain clinic evaluation.[10] (*Id.*).

Between June 24 and November 10, 2010, Anderson met with a social worker at the Chicago Family Health Center on four separate occasions. (R. at 407–08). The

---

[9] The ALJ incorrectly identifies Shepard as a rheumatologist. (R. at 25, 461).

[10] On June 6 and June 27, 2010, Anderson sought emergency room treatment for a diffuse rash, "boils, " and an abscess. Both times she was successfully treated with medication. (R. at 367–71, 379–80).

social worker's notes indicate mild depression and agitation, but contain no diagnosis of bipolar disorder. (*Id.*).

On September 23, 2010, Anderson began treating with Dr. Tracy Muhammad at the Access Community Health Network. (R. at 422). Dr. Muhammad diagnosed Anderson with sciatica neuralgia, fibromyalgia and depression. (*Id.* at 422 & 433). Based on lab results, Dr. Muhammad also diagnosed Anderson with systemic lupus erythromatosis with a current flare up. (*Id.* at 438). The records indicate she will be referred to a rheumatologist. (*Id.*).

A consultative examination was performed by Dr. Liana Palacci on August 26, 2009. (R. at 286–91). Dr. Palacci noted that Anderson can "hold coins and turn doorknobs, button shirts and tie shoelaces and put on her socks." (*Id.* at 286). Upon examination the consultant found 16 out of 18 tender points positive for fibromyalgia. (*Id.* at 288). She also found that Anderson had no limitation in her range of motion and her grip strength was normal. (*Id.*). The consultant noted that Anderson refused to perform knee squats but she was polite, pleasant and cooperative. (*Id.* at 288). Dr. Palacci diagnosed "[p]oorly controlled fibromyalgia." (*Id.*).

A physical residual functional capacity assessment prepared by Dr. Young-Ja Kim on September 8, 2009 found that Anderson could lift 50 pounds occasionally, 25 pounds frequently, stand 6 hours per day and sit 6 hours a day. (R. at 293). The RFC indicates that no postural limitations were warranted. The RFC concludes that Anderson's "statements are consistent with the medical evidence as to her pain and [positive] trigger points. However, there are not functional losses so the statements

11

can only be found partially credible." (*Id.* at 299). That RFC was affirmed on January 8, 2010. (*Id.* at 456–58).

## B. Analysis

Plaintiff raises three arguments in support of her request for a reversal: (1) the ALJ's credibility determination was contrary to SSR-96-7p;[11] (2) the ALJ's Physical Residual Functional Capacity Assessment is without medical basis; and (3) the ALJ failed to explain the manipulative limitations he placed on the RFC.

### 1. The ALJ's Credibility Determination

Plaintiff asserts that the ALJ improperly relied on boilerplate language and made a conclusory finding on credibility when he found that Anderson's "statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the residual functional capacity assessment."[12] (Plf.'s Mot. 4) (citing R. at 24). Plaintiff also complains that the ALJ

---

[11] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

[12] The boilerplate language complained of by Plaintiff is the same language that the Seventh Circuit has repeatedly described as "meaningless boilerplate" because it "yields no clue to what weight the [ALJ] gave the testimony" and fails to link conclusory statements with the objective evidence in the record. *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). However, "the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013). Despite the use of the boilerplate, the ALJ understood that "whenever statements about the intensity, persistence or functionality . . . are not substantiated by objective medical evidence" he was required to "make a finding on the credibility of the statements based on a consideration of the entire case record." (R. at 24). The Plaintiff's re-

erroneously (1) required objective evidence to "wholly support" Anderson's com-
plaints of pain; (2) ignored the sufficient objective evidence that supports Ander-
son's claims of pain from fibromyalgia; (3) required treatment records between 2002
and 2008 despite the onset date of January 2009; (4) described her treatment as
routine and conservative in nature; and (5) found that Anderson was not coopera-
tive in her consultative exam. (*Id.* 5–9).

The ALJ found Anderson only partially credible because (1) the most significant
objective sign of her pain is tender trigger points and an elevated ANA rate back in
2002; (2) there is no indication of limitation in range of motion; (3) she refused to
perform squats at her consultative exam; (4) there are few treatment records be-
tween 2002 and June 2008; (5) she did not begin treatment until one month after
filing for benefits; (6) she received routine and conservative treatment from Dr.
Sales; (7) she did not appear physically uncomfortable at the hearing; and (8) there
is no diagnosis of bipolar/depression in the file. (R. at 26). While the Court believes
that the ALJ carefully considered this case, the Court finds that a remand is neces-
sary to address several of the matters raised by Plaintiff.

### a. ALJ required objective evidence of pain

The ALJ's finding that Plaintiff's allegations of pain are not fully supported by
the medical evidence (R. at 26) is not a legitimate reason for rejecting Plaintiff's
credibility. "The ALJ may not discredit a claimant's testimony about her pain and

liance on *Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 787 (7th Cir. 2003), is mis-
placed. While the Court is concerned about several errors in the ALJ's analysis, the ALJ
knew the proper analysis to conduct, and the Court will not remand the case because of his
inclusion of the boilerplate language.

limitations solely because there is no objective medical evidence supporting it." *Villano,* 556 F.3d at 562; *see also Parker v. Astrue,* 597 F.3d 920, 922 (7th Cir. 2010) (rejecting statement that "there is little objective evidence to support the claimant's allegations of extreme pain" as legally insufficient). Instead,

> because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence.

SSR 96–7p, at *1. Furthermore, the physical basis of the disability in this case includes fibromyalgia and migraine headaches, which are not measured by x-rays and laboratory results. *See* 20 C.F.R. § 404.1529(c)(2) (pain will not be rejected solely based on objective findings); *Scott v. Astrue,* 647 F.3d 734,736 (7th Cir. 2011) (reversing denial of benefits where although the "objective medical evidence" showed the plaintiff's "knees were normal and her spine showed only minimal degeneration", "her medical records are replete with instances in which she complained to other doctors about back and knee pain"); *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996) (fibromyalgia is based on subjective, rather than laboratory, findings).

### b. Factual errors in dates of treatment and reports of elevated ANA rates

The ALJ clearly based his credibility finding, in part, on the "sparse evidence of treatment between 2002 and June 2008" and commented that "[i]nterestingly, she started seeing Dr. Sales one month after filing for disability benefits." (R. at 26). According to the ALJ "[it] would stand to reason that had the claimant been experi-

ence [sic] the severe pain and discomfort alleged, she would have sought regular treatment between 2002 and 2008." (*Id.*).

First, the Plaintiff began treatment with Dr. Sales in November 2007, not June 2008. And she filed for benefits in May 2009, a full 18 months after she began treating with Dr. Sales. Moreover, with an alleged onset date of January 2009, Anderson has presented medical records documenting fifteen months' worth of treatment prior to the onset date. As Anderson points out, there is no requirement that a person submit medical records for years prior to the alleged onset date. In fact, records spanning one year prior to alleged onset date is common. *See* POMS §§ DI 22505.001, 22505.006.[13]

In terms of objective medical evidence, the ALJ stated that the "most significant objective sign of pain has been the tender trigger points and an elevated ANA rate back in 2002." (R. at 26). However, Anderson tested positive for an elevated ANA antibody level twice between 2002 and the hearing; first when she was tested at Roseland Hospital on October 6, 2009 (*id.* at 330), and again when she was tested by Dr. Muhammad on September 23, 2010 (*id.* at 428). Based on the latter test, Dr. Muhammad diagnosed "systemic lupus erythromatosis and is currently experiencing a lupus flare." (*Id.* at 438). The ALJ's conclusion that the most significant sign of

---

[13] The Program Operations Manual System (POMS) "is a handbook for internal use by employees of the Social Security Administration." *Parker v. Sullivan*, 891 F.2d 185, 189 n. 4 (7th Cir. 1989). While POMS instructions "are not products of formal rulemaking," *Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffler*, 537 U.S. 371, 385 (2003), and have "no legal force," *Parker*, 891 F.2d at 190, "they nevertheless warrant [the Court's] respect," *Keffler*, 537 U.S. at 385.

her pain was an elevated ANA rate back in 2002 is not accurate and requires remand.

The Court cannot determine that these factual misunderstandings did not impact the ALJ's credibility determination. Because the ALJ relied on both of these erroneous facts in finding Anderson less than credible, remand is required.

### c. *Nature of treatment*

The ALJ also based his credibility finding on his belief that "[m]ost of the treatment from Dr. Sales was routine and conservative in nature." (R. at 26). But continual pain medication is the established treatment for fibromyalgia,[14] and Anderson was on pain medication during the entirety of her treatment between June of 2007 and the final medical record submitted for treatment in September of 2010. At her September 23, 2010 visit, Anderson was prescribed 500 mg of Vicodin to be taken every 6 hours as needed for pain. (*Id.* at 424). In fact, the consultative examiner Dr. Palacci diagnosed uncontrolled fibromyalgia, indicating that the pain medication was not in itself enough for Anderson's fibromyalgia. Further, the ALJ did not address Anderson's testimony that she changed treating physicians precisely because she "just didn't feel like [she] was getting anywhere with Dr. P. Sales," who was "just giving me pain meds" (*id.* at 40), precisely the conservative approach relied on by the ALJ to discredit Anderson's testimony. Finally, Dr. Muhammad's rec-

---

[14] "Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues. . . . While there is no cure for fibromyalgia, a variety of medications can help control symptoms." <www.mayoclinic.com/health/fibromyalgia>

ords recommend physical therapy (*id.* at 424), as testified to by Anderson, (*id.* at 40), a factor not considered by the ALJ.

### d. *Anderson's refusal to perform squats*

The ALJ, in analyzing Plaintiff's credibility, indicated that during the consultative examination Anderson "refused to perform squats but no reason was given for this." (R. at 26). Plaintiff complains that "before relying on that to discredit Ms. Anderson's testimony, the ALJ should have asked her about that at the hearing." (Mot. 8). In light of the consultant's statement that Anderson was "appropriate, polite, pleasant ad cooperative" and "overall effort and cooperation were excellent" (R. at 288), the Court finds that the ALJ should have inquired into this issue prior to relying on her declining to perform squats to detract from her credibility.

### e. *Summary*

The factual errors discussed above require a remand for a reconsideration of the ALJ's credibility determination. *Allford v. Barnhart,* 455 F.3d 818, 821 (7th Cir. 2006) ("The administrative law judge based his judgment call on a variety of considerations but three of them were mistaken. Whether he would have made the same determination had he not erred in these respects is speculative."). However, on remand, the ALJ remains free to consider that fact that the medical records contain "no indication in significant limitation in range of motions, neurological deficits and difficulty maneuvering" (R. 26), and that, despite her testimony that she needed to change positions frequently and had immediate pain upon sitting, "she did not ap-

pear uncomfortable at the hearing." (*Id.*). The ALJ may also consider the lack of any records diagnosing Anderson with bipolar disorder. (*Id.*).

### 2. *The ALJ's failure to explain the manipulative limitations*

The RFC limits Anderson to "performing fine and gross manipulations with [her] right hand." (R. at 23). Anderson contends that "the ALJ fails to explain *what* the find and gross manipulations are—is Ms. Anderson limited to only rare, occasional, or frequent fine and gross manipulation?" (Mot. 12). Anderson argues that this distinction is important because if she was limited to only *occasional* fine and gross manipulation, the occupations identified by the VE would be eliminated. (*Id.* 12–13).

The ALJ's hypothetical inquiries of the VE did not include the term "fine and gross manipulation." Instead, the ALJ asked the VE whether there were jobs available for someone who was "limited in handl[ing] and fingering with their right hand." (R. at 54; *see id.* at 55, 59–60). The VE identified three occupations that a person limited to either frequent or occasional handling and fingering with their right hand could perform. (*Id.* at 54–55, 59–60). Specifically, the VE stated that such a person could perform the occupations of an information clerk, DOT 237.365-018; cashier, DOT 211.462-010; and sorter, DOT 521.687-08.[15] (*Id.*). The VE further testified that his opinions were consistent with the DOT. (*Id.* at 57).

---

[15] The Dictionary of Occupational Titles (DOT), published by the Department of Labor, gives detailed physical requirements for a variety of jobs. *Prochaska v. Barnhart*, 454 F.3d 731, 735 n. 1 (7th Cir. 2006). The Social Security Administration has taken "administrative notice" of the DOT. *See* 20 C.F.R. § 416.966(d)(1). The transcript identifies an information clerk as having a DOT classification of 237.365-018 (R. at 55), which does not exist. An information clerk's correct DOT classification is 237.367-018.

The Commissioner defines "handling" as "seizing, holding, grasping, turning, or otherwise working with the hand or hands. Fingers are involved only to the extent that they are an extension of the hand." POMS § DI 225001.001(B)(37). "Fingering" is defined as "picking, pinching, or otherwise working the fingers primarily (rather than with the whole hand or arm as in 'Handling')." *Id.* § DI 225001.001(B)(32). The physical demands of an information clerk and a sorter include *frequent* handling and *occasional* fingering. U.S. Dep't of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* 203, 336 (1993). The physical demands of a cashier include *frequent* handling and *frequent* fingering. *Id.* 333.

Thus, if by limiting Anderson to "performing fine and gross manipulation with the right hand," the ALJ was limiting her to "occasional handling" or to "occasional handling and fingering," the occupations identified by the VE would be eliminated. If, on the other hand, the ALJ was limiting Anderson to "occasional fingering," she would be able to perform the information clerk and sorter occupations.[16] On remand, the ALJ shall clarify, with the assistance of a VE, whether performing fine and gross manipulation with the right hand is equivalent to fingering or handling or both, and whether the medical record limits Anderson to frequent or occasional manipulation of her right hand.

---

[16] While the cashier position would be eliminated, there would still be a significant number of jobs available. The VE identified 4,800 information clerk jobs and 2,800 sorter jobs in the local economy. (R. at 55, 59–60). "[I]t appears to be well-established that 1,000 jobs is a significant number." *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009).

## C. Summary

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to [his] conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall reassess Anderson's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate Anderson's physical and mental impairments and RFC, considering all of the evidence of record, including Anderson's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rulings. Finally, with the assistance of a VE, the ALJ shall determine whether there are jobs that exist in significant numbers that Anderson can perform.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion to Reverse the Final Decision of the Commissioner of Social Security [14] is GRANTED and Defendant's Motion for Summary Judgment [15] is DENIED. Pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision is reversed and remanded.


E N T E R:

Dated: November 21, 2013

_____
MARY M. ROWLAND
United States Magistrate Judge